Herold v. United States Express Co.

---

JOHN HEROLD, APPELLEE, v. UNITED STATES EXPRESS COMPANY, APPELLANT.

FILED APRIL 16, 1915.  No. 18096.

1. **Carriers: SHIPMENT OF LIVE STOCK: LIABILITY.** While a common carrier of live stock is not an insurer against injuries unavoidably resulting from the inherent nature or propensities of the animals, yet, where animals are shipped, it is its duty to exercise such care as the circumstances indicate is reasonably necessary in order to safely transport them, and if, on account of a failure to exercise such care, the animals are injured, are lost, or die, the carrier may be liable in damages.

2. ———: ———: REASONABLE CARE: QUESTION FOR JURY. Where the evidence shows that, where a large hog is shipped in a crate in hot weather, reasonable care requires that it be cooled at intervals by wetting the animal and the bedding in the crate, and that it be furnished plenty of water, the question whether such care was exercised by the carrier, taking into consideration the size of the animal, the heat of the day, the manner of crating, and all the surrounding circumstances, is one for the jury.

3. **Evidence** examined, and *held* to support the verdict.

APPEAL from the district court for Pawnee county: JOHN B. RAPER, JUDGE. *Affirmed.*

*Hazlett & Jack* and *Walter Vasey,* for appellant.

*J. C. Dort, contra.*

Herold v. United States Express Co.

LETTON, J.

On May 26, 1911, the plaintiff delivered to defendant two brood sows properly crated for transportation to Newton, Mississippi, which were never delivered. This action is brought to recover the value of the sows and crates. The jury found for plaintiff, and defendant appeals.

The principal error relied on is that the evidence is not sufficient to sustain the verdict. Receipt of the hogs and failure to deliver them was admitted by the defendant. Defendant insists that the evidence conclusively shows that the loss of the sows was caused by the excessive heat and the inherent nature and propensities of the animals. On the other hand, the plaintiff, insists that, the defendant having accepted the animals for shipment, it was bound, to provide food and water, and exercise such other care as was reasonably necessary under the conditions and circumstances for their safe transportation; that the evidence failed to show the exercise of such care, and shows neglect to see that the hogs were properly fed, watered and cooled.

The testimony for the defense shows that the sows were loaded at Lewiston, Nebraska, about 1:30 P. M.; that the thermometer stood about 90 degrees; that they were properly cooled at Horton, where they were loaded on a train bound for Topeka, where they were again changed to a train running to Kansas City. The agent at Topeka testified that when they were received they were apparently pretty warm and when unloaded were left upon the platform so as to receive as much air as possible; that they appeared to cool down and were in good condition when loaded for Kansas City, which was reached at 1:40 A. M. next morning. The messenger in charge to Kansas City said that when they reached there the hogs appeared to be in good condition, but that he did not feed nor water them. At Kansas City they were placed in an express car for St. Louis about 8 A. M., and were then in good condition. Mr. Moritz, the express messenger between Kansas City and St. Louis, testified that the crates were placed opposite open doors in an express car; that he observed at a certain point that the two sows were very warm and restless; that they

Herold v. United States Express Co.

ate a little food, and that he offered them water about 35 or 40 miles east of Kansas City, but they refused it and rooted the basin away; that they were not in the car where he worked; and that about an hour or an hour and a half afterwards, 3½ hours after they left Kansas City, he noticed, at a point a few miles east of Winslow, that a slat at the head end of one of the crates had been gnawed, and that one of the hogs was gone; that he wired the loss of the hog to the route agent, and a search was made, but she could not be found; that the end slats were nailed to the ends of the side slats of the crates; that the other sow was overheated; that he offered it water, which it refused, but did not offer it food; that it was frothing and bleeding at the mouth; that she jumped around in the crate and seemed wild and ferocious; that he turned this sow and the empty crate over to the agent at St. Louis about 8 o'clock in the evening. On cross-examination he said he noticed the hog was frothing at the mouth about three-quarters of an hour after leaving Kansas City, but did not water it then or try to cool it off, and that he offered water one-half or three-quarters of an hour afterwards, and that he threw no water on the hogs nor watered them, except as stated, though he saw they were getting hot; that he took all the straw out of the crates because he thought they would be cooler without it. He had handled a great many hogs. The crate was in good condition when it left Kansas City. The agent at St. Louis and another witness testified the sow was very hot when she came in, was panting, and had been gnawing the crate. He thought the crate was large enough; that the sow was offered food and water three or four times after arrival at St. Louis, and she was placed in the basement of the express office, where it was cooler, but she died about 11 P. M. The temperature was about 92 degrees. The agent also testified, as an expert, that it was extremely dangerous to carry a hog by express when the temperature was so high.

The plaintiff testified that the sows were due to pig in about two weeks; that the two of them weighed about 640 pounds; and that they were full-blooded, registered

Poland-China; that they were in the very pink of condition; that they were placed in strong crates with attached feed troughs and water buckets so that they could be fed and watered; that they had been washed off and crates bedded with wet alfalfa a few minutes before they were loaded; that he had been in the hog shipping business for about 8 years; that these crates were in standard form, and he had shipped and received a great many hogs in crates of this kind without any trouble. The slats on the front end of the crate were of seven-eighths inch lumber and were nailed to oak corner posts. On rebuttal the plaintiff testified, as an expert that he heard the testimony of Moritz that he removed the bedding from under the hogs when it became too hot in the car; that what should have been done was that the bedding should have been wet around the belly and lower sides of the hog until the hog cooled down. Other expert witnesses testified that the proper method is to have the bedding wet down at proper intervals, and the legs and lower part of the body cooled; that a bucket full of water would pretty thoroughly wet the hog and the bedding, and this would be required from one to two hours apart on such a day.

We think defendant has not definitely proved that the sows were watered or cooled off at Kansas City, the two witnesses each saying that the sows had been watered; but, when pressed on cross-examination, each said that he did not see them watered and did not know that they had been fed or watered, but he saw water about the pan in the crates.

From the time the sows were cooled down at Horton and watered at Holton, Kansas, in the early evening of the 26th, no attempt was ever made to cool them by the use of water, which the evidence shows was plainly necessary in such weather, to the knowledge of the employees of the express company. After Moritz took the bedding away, even this could not have been effectively done. When offered water that forenoon, they had become so restless and uneasy that they refused it. It was an hour or an hour and a half afterwards before the first sow was missed.

Its escape was in all probability due to its frantic efforts to procure relief. Apparently no attempt was made to water or cool the other sow until after she reached St. Louis. It seems to us that, if the sows had been watered and cooled down at Kansas City, they would not have shown the symptoms they did so soon after leaving there. How often they should have been cooled depended on the temperature of the day and of the hogs. Moritz knew they suffered from heat, but did nothing that whole day but offer them a little food and water, which is shown to be ineffective care. We are also of the opinion that the crates were sufficient. Under these circumstances, the evidence fails to show that reasonable care was taken for the safe carriage of these animals.

An inspection of the instructions shows that the principles of law governing the case were properly laid down, and the defendant makes no complaint that the jury were misdirected.

The evidence sustains the verdict, and the judgment of the district court is

AFFIRMED.

BARNES, FAWCETT and HAMER, JJ., not sitting.